IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DONYELLE PLESHETTE MORTON-THOMPSON,        )
           )
    Plaintiff,        )
           )
    v.        )    Civil No. 3:14cv179 (REP)
           )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social Security,    )
    Defendant.        )
_____)

## REPORT AND RECOMMENDATION

Donyelle P. Morton-Thompson ("Plaintiff") is forty-five years old and previously worked as a special education instructional assistant. On September 3, 2010, Plaintiff applied for Social Security Disability Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from arthritis, anemia, asthma, migraine headaches and fibromyalgia with an alleged onset date of June 22, 2010. Plaintiff's claims were denied both initially and upon reconsideration. On September 6, 2012, Plaintiff (represented by counsel) appeared at a hearing before an Administrative Law Judge ("ALJ"). The ALJ subsequently denied Plaintiff's claims in a written decision on September 21, 2012. On January 30, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in failing to afford controlling weight to the opinion of Plaintiff's treating physician and treating psychologist, in accepting and assigning weight to the opinions of the state agency consultants, in assessing Plaintiff's credibility and in determining Plaintiff's

residual functional capacity ("RFC"). The parties have submitted cross-motions for summary judgment that are now ripe for review. Having reviewed the entire record in this case, the Court is now prepared to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, relevant medical records, hearing testimony and state agency consultants' opinions are summarized below.

### A. Education and Work History

Plaintiff completed three years of college education. (R. at 201.) Plaintiff previously worked as an instructional assistant in a school, in retail sales, and as a teacher's assistant in a daycare. (R. at 201.)

### B. Medical Records

On January 18, 2010, Plaintiff saw Lind Reiss, C.F.N.P. at Courthouse Family Practice, complaining of joint pain. (R. at 364.) Plaintiff stated that she was diagnosed with fibromyalgia three years earlier and that she was not sleeping well and believed that she had sleep apnea. (R. at 364.) Ms. Reiss noted that Plaintiff's doctor at the Medical College of Virginia ("MCV") Sleep Clinic had opined that Plaintiff did not have fibromyalgia and instructed her to keep a

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

sleep diary to determine whether she had insomnia. (R. at 364.) Ms. Reiss reported that Plaintiff's other health issues included anemia, asthma and gastroesophageal reflux disease ("GERD"). (R. at 364.) Plaintiff complained of constant pain since running out of her Prilosec. (R. at 364.) She reported normal bowel movements without blood, and attributed her occasional nausea to taking Cymbalta, which she took sporadically. (R. at 364.) Plaintiff used an albuterol inhaler for her asthma and took vitamin D supplements and Allegra. (R. at 364.) Plaintiff reported seeing a rheumatologist and a podiatrist, who instructed her to wear a boot for heel spurs for three months. (R. at 364.)

Ms. Reiss performed a physical examination of Plaintiff and observed that she was alert, oriented and in mild discomfort. (R. at 364.) The examination produced normal results except that Plaintiff was tender across all fibromyalgia trigger points. (R. at 364.) Her abdomen was soft without organomegaly or mass, but Plaintiff had diffuse tenderness throughout the midline without rebound or guarding. (R. at 364.) Ms. Reiss assessed Plaintiff as having fibromyalgia, a history of insomnia, GERD, asthma, a history of seasonal allergic rhinitis and a history of anemia. (R. at 364.) She referred Plaintiff to a gastroenterologist for an upper endoscopy. (R. at 365.) Ms. Reiss instructed Plaintiff to obtain a copy of her medical records as soon as possible, return for a physical with fasting bloodwork, keep her next appointment with her rheumatologist and sleep specialist and continue her Allegra, Prilosec, Cymbalta, albuterol and vitamin D. (R. at 365.)

On February 15, 2010, Plaintiff saw Giles M. Robertson, Jr., M.D., complaining of regurgitation and severe abdominal and epigastric pain. (R. at 339-41.) In a letter to Plaintiff's primary care physician, Gail L. Taylor, M.D. of Courthouse Family Practice, Dr. Robertson stated that Plaintiff had a history of chronic constipation, fibromyalgia, migraine headaches and

asthma. (R. at 350.) Plaintiff also complained of difficulty walking because of diffuse pain in her muscles. (R. at 350.) Dr. Robertson stated that his examination of Plaintiff was unremarkable, except that Plaintiff had epigastric and right-sided abdominal wall tenderness that increased when Plaintiff raised her legs. (R. at 350.) Dr. Robertson's rectal examination revealed brown stool with blood. (R. at 350.) Dr. Robertson diagnosed Plaintiff with bloody stools, epigastric pain with GERD, abdominal wall muscle discomfort, fibromyalgia and asthma. (R. at 350.) He ordered a gastroscopy and colonoscopy, and instructed Plaintiff to use a heating pad for discomfort. (R. at 350.)

On February 19, 2010, Dr. Robertson performed an esophagogastroduodenoscopy ("EGD") and a colonoscopy. (R. at 384-85.) The EGD revealed a normal esophagus and duodenum. (R. at 384.) Dr. Robertson noted mild erythema of the mucosa in Plaintiff's antrum, which was compatible with mild gastritis in the stomach. (R. at 384.) Dr. Robertson reported that no definitive cause for Plaintiff's pain was found during this procedure. (R. at 384.) The colonoscopy revealed Grade 1 inflamed internal hemorrhoids, but no polyps, diverticulosis or cancer. (R. at 385.) Dr. Robertson stated that these hemorrhoids were the likely cause of Plaintiff's bleeding and bloody stools. (R. at 385.) Dr. Robertson instructed Plaintiff to return for a follow-up visit in a few weeks, follow-up with Dr. Taylor as needed, continue taking her current medications and eat a high fiber diet. (R. at 384-85.)

On March 2, 2010, Plaintiff returned to Dr. Robertson, complaining of mild cramping discomfort in her abdomen. (R. at 339, 349.) In a letter to Dr. Taylor, Dr. Robertson noted that Plaintiff's EGD, colonoscopy and Helicobacter test returned normal results. (R. at 349.) Plaintiff's lab studies were also normal, including her amylase and lipase levels. (R. at 349.)

4

Indeed, no specific abnormality was detected. (R. at 349.) Dr. Robertson prescribed Bentyl four times per day for irritable bowel syndrome ("IBS"). (R. at 349.)

On May 12, 2010, Plaintiff saw William N. Roberts, M.D. of the Rheumatology Department at MCV, complaining of chronic widespread pain. (R. at 399.) Dr. Roberts's physical examination produced normal results. (R. at 399.) He assessed sacroiliac ("SI") osteoarthritis, chronic widespread pain, possible sleep apnea, possible rheumatoid arthritis and asthma, and ordered x-rays of Plaintiff's chest, hands and left shoulder. (R. at 399-403.) Plaintiff's chest x-ray showed no acute cardiopulmonary abnormalities and no significant changes from Plaintiff's 2003 chest x-ray. (R. at 402.) Three images of each of Plaintiff's hands showed normal alignment and bone mineralization, and no significant arthritic changes. (R. at 403.) The two images of Plaintiff's left shoulder showed anatomical alignment at the glenohumeral joint and no significant arthritic changes. (R. at 403.)

On June 11, 2010, Plaintiff saw Susanna A. Mathe, M.D. at Neurological Associates, Inc., complaining of numerous issues and seeking to rule out a neurological etiology. (R. at 380.) Plaintiff stated that she had been diagnosed with fibromyalgia and complained of extreme pain all over her body, including her head. (R. at 380.) Plaintiff complained of chest pains, palpitations, constipation, abdominal pain, shortness of breath, muscle and joint pains, muscle and joint swelling, headaches, trouble sleeping and weight gain. (R. at 381.) Additionally, Plaintiff stated that she heard a popping noise when she turned her head that was followed by shooting pain from her neck to her head, as well as some tingling in her hands, lightheadedness and dimmed vision. (R. at 380.)

Dr. Mathe examined Plaintiff and reported that she was alert, oriented and did not appear to be in acute physical distress. (R. at 381.) Plaintiff's blood pressure and pulse were normal,

5

her heart was regular and rhythmic, her lungs were clear and her abdomen was benign. (R. at 381.) Plaintiff had no clubbing or cyanosis in her extremities and her cranial nerves II through XII were completely intact. (R. at 381.) Her neck was supple. (R. at 381.) Plaintiff demonstrated full motor and strength in the major muscle groups in her arms and legs and had no neurofibromas, but she complained of pain in every muscle group tested. (R. at 381.) Her deep tendon reflexes were normal and she had no pathological reflexes. (R. at 381.) Plaintiff achieved normal results on finger-nose-finger, rapid hand pat and rapid alternating movements tests. (R. at 381.) Plaintiff demonstrated steady gait on straightaway, toe, heel, tandem and hop. (R. at 381.) Her Romberg test was negative, and her sensory examination was completely normal. (R. at 381.) Dr. Mathe described Plaintiff's neurological examination as completely normal and opined that there was not a neurological etiology for Plaintiff's pain. (R. at 381.)

On June 16, 2010, Plaintiff returned to Courthouse Family Practice, complaining of fatigue and joint pain. (R. at 362.) Plaintiff stated that she was falling asleep all the time and that sleep apnea had been ruled out as the cause. (R. at 362.) Plaintiff stated that she had swelling in her legs that began six days earlier and that she could not straighten her left leg as a result. (R. at 362.) She also complained of swelling in her hands, shortness of breath and sharp chest pain. (R. at 362.) A physical examination produced normal results with the exception of 1+ pretibial edema and a Baker's cyst at her left knee. (R. at 362.) Plaintiff's urinalysis was negative. (R. at 362.) Dr. Taylor assessed fibromyalgia, lower extremity edema and a Baker's cyst. (R. at 362.) She ordered bloodwork and an echocardiogram, referred Plaintiff to an orthopedist, refilled her albuterol prescription and instructed Plaintiff to return for a follow-up appointment pending her lab results. (R. at 362.)

On June 23, 2010, Plaintiff saw Barry W. Burkhardt, M.D. at West End Orthopaedic Clinic ("WEOC"), complaining of sharp, constant pain in both knees, with the left being more painful than the right. (R. at 328.) Her knee pain began two years ago, but had worsened over the previous four months. (R. at 328.) Gelling was a common symptom, walking was painful and she occasionally experienced the sensation that her knees were "giving way." (R. at 328.) Dr. Burkhardt noted that Plaintiff had been seen at WEOC approximately five years earlier, had an MRI of her knees and was assessed as having patellar chondromalacia. (R. at 328.) He recorded Plaintiff's past medical history as including asthma, arthritis, bowel problems, low blood pressure, acid reflux and fibromyalgia. (R. at 328.) Plaintiff stated that her current symptoms included weight gain, sore throat, nausea, belching, weakness, joint pain, tingling, headache, sinus problems, chest pain, rapid heartbeat, fluid retention and difficulty breathing. (R. at 328.)

Dr. Burkhardt physically examined Plaintiff and reported that she appeared "almost hypersensitiv[e] to touch around both of her knees." (R. at 328.) Plaintiff had patellofemoral crepitus in both knees, slightly lateral riding patellae bilaterally, no effusion, full range of motion, and negative McMurray, Losee and Lachman tests. (R. at 328.) Dr. Burkhardt ordered x-rays of both of Plaintiff's knees from three angles. (R. at 328.) The images showed no acute bony abnormalities except a slightly lateral riding patella as seen in the sunrise view of both knees, with the left being more pronounced than the right. (R. at 328.) Dr. Burkhardt diagnosed Plaintiff with patellar chondromalacia and prescribed neoprene sleeves with felt pads pushing laterally to medially. (R. at 328.) He referred Plaintiff to physical therapy and instructed her to return for a follow-up visit as needed. (R. at 328.)

On July 20, 2010, Plaintiff returned to WEOC and saw Jan Eric Esway, M.D.,
complaining of right ankle pain that began one month earlier. (R. at 379.) Plaintiff described the
pain as sharp, dull and constant, and a five out of ten in severity. (R. at 379.) Daily activities,
weight bearing and working exacerbated her pain, but nothing alleviated it. (R. at 379.) Dr.
Esway examined Plaintiff's right leg and assessed her alignment, gait and station, skin, sensation
and pulses. (R. at 379.) In addition, he performed inspection, palpation, range of motion,
strength and stability testing. (R. at 379.) He reported tenderness and swelling along Plaintiff's
posterior tibial tendon, mild tenderness in the sinus tarsi, flexibility in the hindfoot despite
bilaterally symmetrical relative flatfoot deformity and difficulty on the double leg heel raise test.
(R. at 379.) X-rays showed no acute abnormalities. (R. at 379.) Dr. Esway assessed right
posterior tibial tendonitis with underlying flatfoot deformity and flexible hindfoot. (R. at 379.)
He prescribed a Medrol Dosepak, instructed Plaintiff to wear a fracture boot for three weeks
before transitioning into a lace-up brace and told her to return in five weeks for a follow-up. (R.
at 379.)

On July 28, 2010, Plaintiff returned to MCV for a follow-up appointment with Dr.
Roberts. (R. at 394.) Plaintiff stated that her joint pain had not improved and that Diclofenac
worked, but that the Medrol Dosepak did not help her joint pain or her right eye inflammation.
(R. at 394.) Dr. Roberts examined Plaintiff and observed that she had not lost visual acuity, but
was photophobic in her right eye. (R. at 394.) Her chest was clear and her abdomen was soft.
(R. at 394.) Plaintiff had full, painless range of motion in her elbows and wrists and mild
proximal interphalangeal joint ("PIP") synovitis in all fingers except her thumbs on both hands.
(R. at 394.)

Dr. Roberts concluded that the PIP changes were not inconsistent with inflammation related to osteoarthritis, Heberden and Bouchard nodes. (R. at 395.) However, such changes in a forty-one-year-old were suggestive of "a more systemic inflammatory situation like seronegative rheumatoid arthritis." (R. at 395.) Plaintiff's sedimentation rate was high for someone of her age, but her bloodwork was negative for HLA-B27, rheumatoid factor, anti-CCP and viral hepatitis. (R. at 395.) Her hand and chest x-rays were normal, as was her urinalysis. (R. at 395.) Dr. Roberts concluded that he was unable to conclusively diagnose Plaintiff's issue and noted that he would treat it as undifferentiated synovitis or possible seronegative rheumatoid arthritis. (R. at 395.)

On August 17, 2010, Plaintiff returned for a follow-up appointment with Dr. Esway. (R. at 326.) Plaintiff stated that the boot, Prednisone pack and brace were not helpful in improving her condition. (R. at 326.) Dr. Esway noted that he found this confusing and that he asked Plaintiff multiple times if she had seen improvement, but each time she denied that any of these treatments were effective. (R. at 326.) Plaintiff told Dr. Esway that she had recently been having stomach pain and went to the emergency room for treatment, but no cause was determined. (R. at 326.) Dr. Esway reported that Plaintiff showed less tenderness and swelling, but seemed overly hypersensitive on examination. (R. at 326.) He indicated that her reaction appeared disproportionate to his objective findings, notwithstanding the swelling and tenderness in her sinus tarsi and some reproduction of symptoms with provocative maneuvers of the hindfoot. (R. at 326.) Plaintiff refused to perform a double leg heel raise test. (R. at 326.) Dr. Esway gave Plaintiff a corticosteroid injection in her subtalar joint on her right side and told her to continue wearing the lace-up brace. (R. at 326.)

On September 7, 2010, Plaintiff saw Jerome Smith, M.D. at the Medical & Injury Care Center for a medical evaluation, complaining of constipation and muscle spasms. (R. at 318.) On examination, Dr. Smith observed that Plaintiff weighed 203 pounds, her conjunctivae were pink, her sclerae were non-icteric, she had no visible lesions in her mouth or lymphadenopathy or thyromegaly in her neck, her chest was clear and her heart was normal, her abdomen was soft without organomegaly, masses or tenderness, her neurological function was normal, she had no edema in her extremities and had some left knee swelling. (R. at 318.) Dr. Smith assessed Plaintiff with rheumatoid arthritis, fibromyalgia, chronic bilateral knee pain and irritable bowel syndrome. (R. at 318.) He prescribed Cyclobenzaprine for her muscle spasms. (R. at 319.)

On September 8, 2010, Plaintiff returned for an appointment with Dr. Burkhardt, complaining of pain in both knees that was far worse on the left than the right. (R. at 325.) Plaintiff stated that her right knee pain had improved from using the patellofemoral stabilization brace. (R. at 325.) Dr. Burkhardt noted that Dr. Roberts treated Plaintiff for her rheumatoid arthritis, and that she also had fibromyalgia. (R. at 325.) Plaintiff no longer worked, because her knees bothered her on a daily basis and hampered her mobility. (R. at 325.) Plaintiff asked Dr. Burkhardt about getting a cane. (R. at 325.)

On examination, Plaintiff remained hypersensitive to touch around her knees. (R. at 325.) Dr. Burkhardt reported patellofemoral crepitus in both knees, full range of motion in both knees, stable ligaments, fair strength in Plaintiff's quadriceps and hamstrings, 2+ pulses, intact sensation, and negative McMurray, Losee and Lachman tests. (R. at 325.) He diagnosed rheumatoid arthritis in both knees and patellofemoral arthritis. (R. at 325.) Dr. Burkhardt administered a Cortisone injection in Plaintiff's left knee, prescribed a cane, excused Plaintiff from work and instructed her to follow-up as needed. (R. at 325.)

10

On December 8, 2010, Plaintiff followed-up with Dr. Roberts regarding her joint pain. (R. at 392.) Plaintiff stated that her condition was unchanged and complained of small joint pain in her hands, back pain and worsening gynecological problems. (R. at 392.) Dr. Roberts observed that Plaintiff continued to use a cane and still had some PIP synovitis. (R. at 392.) He noted that there was a remote possibility of sarcoidosis with the reactive airways, and opined that it might be reasonable for Plaintiff to try Methotrexate for twelve weeks. (R. at 393.) He ordered bloodwork and instructed Plaintiff to return for an appointment following her early-2011 hysterectomy. (R. at 393.)

On January 24, 2011, Plaintiff returned for an appointment with Dr. Burkhardt. (R. at 583.) She stated that she experienced significant relief following her September 2010 Cortisone injections, but her knees continued to bother her. (R. at 583.) Her physical examination was unchanged from her previous appointment. (R. at 583.) Dr. Burkhardt diagnosed advanced rheumatoid arthritis in both knees and administered a Cortisone injection in both knees. (R. at 583.) He instructed Plaintiff to apply ice packs to her knees following her appointment and to return as needed. (R. at 583.)

On February 7, 2011, Plaintiff saw Dr. Taylor, complaining of depression and following-up on her upper respiratory infection. (R. at 411.) Dr. Taylor indicated that Plaintiff had been sick for seven days. (R. at 412.) Plaintiff's self-reported symptoms included itchy, painful eyes, purulent nasal discharge, sneezing, sore throat, hoarseness, purulent cough, shortness of breath and wheezing and asthma. (R. at 412.) Dr. Taylor observed that Plaintiff's eyes were red, her cerumen was occluded in her right ear and her face was tender, but Plaintiff's ears, nose, pharynx, neck and lungs were otherwise normal. (R. at 412.) Dr. Taylor assessed Plaintiff as having bronchitis, sinusitis and asthma, and prescribed Zithromax, ProAir, Mucinex, fluids and

rest. (R. at 412.) On February 10, 2011, Plaintiff underwent bloodwork to determine whether she had rheumatoid arthritis. (R. at 419.) Her rheumatoid arthritis factor and antibodies were all within normal limits. (R. at 419.)

On February 22, 2011, Plaintiff returned for a follow-up appointment with Dr. Taylor regarding her depression. (R. at 491.) Plaintiff said that her Paxil prescription was possibly helping her, but also reported feeling overwhelmed, sad, unappreciated, helpless and hopeless. (R. at 491.) She said that she felt like crying all the time, had poor energy, felt slow and could not sleep. (R. at 491.) Dr. Taylor opined that Plaintiff's depression was unimproved and increased her Paxil dosage, prescribed Trazodone and referred Plaintiff to counseling. (R. at 491.)

On February 28, 2011, Plaintiff saw Graenum R. Schiff, M.D. at Tucker Psychiatric for a psychiatric evaluation. (R. at 696.) Plaintiff complained of feeling overwhelmed with anxiety, insomnia and headaches for the past few months. (R. at 696.) Plaintiff also complained of not being able to climb stairs for several months due to rheumatoid arthritis, and of being unable to lose weight despite low appetite. (R. at 696.) Dr. Schiff reported that Plaintiff's memory and cognition were normal, and that she was unhappy and pessimistic with psychomotor retardation, but no delusions or hallucinations. (R. at 696.) He assessed depression, in addition to Plaintiff's preexisting diagnoses of fibromyalgia, rheumatoid arthritis, anemia, uterine fibroids and asthma, and opined that Plaintiff's mood state was secondary to her other illnesses. (R. at 696.) Dr. Schiff recommended that Plaintiff stop taking Paxil and instead take Wellbutrin. (R. at 696.) Dr. Schiff opined that Plaintiff was totally disabled because of all of her illnesses. (R. at 696.)

On March 3, 2011, Plaintiff underwent a cervical spine x-ray in preparation for her hysterectomy. (R. at 449.) The images revealed a normal cervical spine. (R. at 449.) Plaintiff's

cervical vertebral bodies were normal in height and alignment, and there was no evidence of fracture, subluxation or focal bony abnormality. (R. at 449.) The disc spaces were well maintained. (R.a t 449.) There was mild anterior hypertrophic spurring and anterior spinal calcification at C5-C6. (R. at 449.) The prevertebral soft tissues were normal and Plaintiff showed no instability on flexion or extension. (R. at 449.)

On March 24, 2011, Plaintiff was seen by Tammy Walters, PA-C at Virginia Psychological Associates ("VPA") for a psychiatric assessment. (R. at 551.) She stated that she felt overwhelmed and cried frequently, and did not feel that her medications were helping. (R. at 551.) Plaintiff reported trouble sleeping, pain and decreased energy and appetite. (R. at 551.) She rated her mood a one out of ten. (R. at 551.) On examination, Plaintiff appeared neat and clean, maintained good eye contact and showed no agitation. (R. at 553.) Her behavior was pleasant and appropriate, she had no delusions or hallucinations, and her memory was intact. (R. at 553.) Plaintiff's affect was constricted and tearful, but she had no suicidal or homicidal ideations. (R. at 553.) Plaintiff had good insight and judgment, and she was oriented to all spheres. (R. at 553.) She was diagnosed with single episode major depression of moderate severity, with a Global Assessment of Functioning ("GAF")[2] score of 60. (R. at 553.) Plaintiff's prescriptions for Wellbutrin and Trazodone remained unchanged. (R. at 553.)

On March 28, 2011, Plaintiff saw Helen Lamberta, N.P. of the Department of Rheumatology at MCV, complaining of pain, stiffness and fatigue in her neck, back, chest wall,

---

[2]    The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate the social, occupational and psychological functioning of adults. (R. at 20.) Scores ranging from 51-60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. (R. at 20.) Notably, the current version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") has dropped the use of GAF scores, noting that they have been criticized due to a "conceptual lack of clarity," and "questionable psychometrics in routine practice." DSM-5 16 (American Psychiatric Association 2013.)

shoulders, fingers, knuckles, wrists, right thigh, both knees and ankles. (R. at 530.) Plaintiff stated that her back and knees hurt when she stood and she could not stand for any period of time, her fingers hurt all the time, and her vision had gotten worse since her last visit. (R. at 530.) Plaintiff stated that her current symptoms included weakness, fatigue, blurry vision, back pain, joint pain, muscle pain, decreased range of motion and abnormal balance. (R. at 531.) Her current medications included Tylenol with Codeine, ProAir, Bupropion, Flexeril, Allegra, Methotrexate, Prilosec, Arthrotec, vitamin D, folic acid and multivitamins. (R. at 531-32.) Plaintiff appeared in moderate distress but her physical examination was normal with the exception of her musculoskeletal system. (R. at 532.) Plaintiff used a cane in either hand for balance, had cervical and lumbosacral tenderness, bilateral shoulder pain and decreased range of motion that was worse on the left than the right, bilateral wrist pain, CMC joint pain, PIP and distal interphalangeal ("DIP") joint pain, a positive Tinel sign in her right middle finger, right trochanter bursae pain, bilateral knee pain without synovitis, SI joint pain, and bilateral ankle and tarsus pain. (R. at 532.) Ms. Lamberta assessed seronegative rheumatoid arthritis, fibromyalgia, bilateral erosive sacroiliitis and lumbar facet disease, GERD and asthma. (R. at 534.) She instructed Plaintiff to return for a follow-up in six to eight weeks, ordered bloodwork, prescribed Methotrexate and folic acid, and scheduled a bone density baseline test for Plaintiff's next visit. (R. at 534.)

On April 11, 2011, Plaintiff saw Dr. Burkhardt, complaining of continued knee pain. (R. at 582.) Plaintiff indicated that the January 24, 2011 Cortisone shots helped for two or three weeks. (R. at 582.) She stated that she continued to experience swelling and the sensation that her knees were giving way occasionally. (R. at 582.) On examination, Dr. Burkhardt observed that Plaintiff remained hypersensitive to touch around her knees. (R. at 582.) He observed some

patellofemoral crepitus bilaterally, stable ligaments, fair quadriceps and hamstring strength in both knees, full range of motion bilaterally and negative McMurray, Losee and Lachman tests. (R. at 582.) Plaintiff's pulses were 2+ in both ankles, her light touch sensation was intact in her bilateral toes, and she had no skin rashes on her body. (R. at 582.) Dr. Burkhardt diagnosed rheumatoid arthritis in both knees, suggested that Plaintiff start a quadriceps exercise program, reviewed the pros and cons of Synvisc with Plaintiff and prescribed Synvisc for her right knee. (R. at 582.)

Plaintiff saw E. Forrest Jessee, M.D. of Arthritis Specialists, Ltd. on April 12, 2011, and May 9, 2011, complaining of muscle and joint pain and seeking a fibromyalgia and rheumatoid arthritis evaluation. (R. at 557-567.) Dr. Jessee obtained Plaintiff's medical history and performed a physical examination of Plaintiff, noting thirty-seven trigger points. (R. at 557-58.) He noted that he did not observe any active synovitis or deformity to suggest rheumatoid arthritis. (R. at 558.) Plaintiff had tenderness along her entire thoracic and lumbar spine. (R. at 558.) Based on his examination and Plaintiff's history of poor sleep patterns, depression and failure to respond to steroid tapers, Dr. Jessee opined that fibromyalgia was more likely than rheumatoid arthritis. (R. at 557.) He instructed Plaintiff to stop Methotrexate, prescribed Tramadol, and increased Plaintiff's Trazodone prescription to help with her insomnia. (R. at 558-59.) Dr. Jessee also ordered bloodwork, urinalysis and x-rays of Plaintiff's back. (R. at 558-59.) X-rays of Plaintiff's lumbar and thoracic spine taken on May 9, 2011, showed that the vertebral body heights and disc spaces were maintained and that there was no evidence of fracture, subluxation or significant degenerative change, although Plaintiff exhibited mild right convex curvature in her thoracic spine. (R. at 566-67.) The thoracic spine images indicated

degenerative disc disease ("DDD") with endplate osteophyte formation at the C5-C6 level. (R. at 567.)

On April 20, 2011, Plaintiff returned to VPA. (R. at 550.) She stated that her mood had not improved, she was having hot flashes and she had developed a rash that she believed was caused by Wellbutrin. (R. at 550.) On examination, Plaintiff appeared healthy, well-groomed and relaxed, and was oriented to all spheres. (R. at 550.) Plaintiff's affect was constricted, but her examination produced otherwise normal results. (R. at 550.) Ms. Walters diagnosed Plaintiff with major depression, prescribed Celexa, and told her to return for a follow-up in one month. (R. at 550.) Plaintiff followed-up at VPA on May 19, 2011, complaining of pain, low energy and poor memory. (R. at 549.) Her mood had improved with Celexa and her examination remained unchanged. (R. at 549.) Plaintiff was diagnosed with major depression and fibromyalgia, and her Celexa dosage was increased. (R. at 549.)

On May 23, 2011, another doctor contacted Dr. Burkhardt to obtain his assessment of Plaintiff's abilities. (R. at 580.) Dr. Burkhardt stated that in his opinion, Plaintiff "was not totally disabled from doing any kind of work" and could "certainly be qualified to do sedentary-type work." (R. at 580.)

Plaintiff returned to Dr. Jessee for a follow-up appointment on June 6, 2011, regarding her fibromyalgia and backache. (R. at 663.) Dr. Jessee observed thirty tender joints, sixteen trigger points and no swollen joints. (R. at 663, 673.) He switched Plaintiff to Neurontin, because she reacted poorly to Tramadol. (R. at 663.) Dr. Jessee reviewed Plaintiff's May 2011 thoracic spine x-rays and opined that it was unlikely that the slight convex curvature visible in the images was causing Plaintiff's pain. (R. at 663.) He noted that Plaintiff's May 2011 lumbar spine imaging and lab work were normal. (R. at 663.) Dr. Jessee ordered x-rays of Plaintiff's

cervical spine, lab work and a bone mineral density scan, and instructed her to return to Dr.

Burkhardt for additional gel injections to ease her osteoarthritis-related knee pain. (R. at 663.)

Dr. Jessee injected Plaintiff's bilateral sacroiliac, trochanteric and anserine trigger points with a

combination of Depo-Medrol and Lidocaine to alleviate her backache, and instructed her to

begin a program of gentle exercise and sleep. (R. at 663.)  He prescribed calcium, vitamin D and

Ambien, and stopped Trazadone. (R. at 663-64.)

On June 16, 2011, Plaintiff followed-up with Ms. Walters at VPA. (R. at 707.)  She

reported that increasing her Celexa prescription made her feel somewhat better and that she

experienced less sadness, but still felt irritable and rated her mood a five or six out of ten. (R. at

707.)  Her exam and diagnosis were unchanged from her previous appointment, and she was

prescribed Abilify. (R. at 707.)  Plaintiff returned on July 14, 2011, and stated that she had

recently experienced trouble walking due to pain and weakness in her knees. (R. at 705.)  At her

appointment, Plaintiff walked slowly and used a cane. (R. at 705.)  Her examination results and

diagnosis were unchanged from her previous appointment. (R. at 705.)

On July 6, 2011, Plaintiff saw Dr. Burkhardt for a follow-up regarding her knees. (R. at

578.)  Plaintiff told Dr. Burkhardt that the Synvisc injection in her left knee did not help her, nor

did the Cortisone shots administered by Dr. Jessee. (R. at 578.)  Plaintiff complained of

occasionally feeling as though her left knee was giving way and occasional swelling, but stated

that her knee did not lock up on her. (R. at 578.)  Dr. Burkhardt noted that Plaintiff denied

experiencing any relief from physical therapy, anti-inflammatory medications, Ibuprofen or

Naproxen. (R. at 578.)  On examination, Plaintiff had full range of motion in her knees as well

as markedly positive McMurray tests bilaterally. (R. at 578.)  She had medial joint line

tenderness in both knees, negative Losee and Lachman tests, fairly strong quadriceps and

17

hamstring strength, no effusion, stable ligaments, good patellar tracking bilaterally, 2+ pulses in both ankles, no skin rash and intact sensation in all toes. (R. at 578.) Dr. Burkhardt ordered x-rays and opined that Plaintiff had remarkably good knees, including good joint space, no significant spur formation, no fracture or dislocation, and only a slight decrease in medial joint space in both knees. (R. at 578.) He diagnosed rheumatoid arthritis in both knees with bilateral medial meniscus tears, and ordered MRIs of both knees. (R. at 578.) The MRIs showed, however, that Plaintiff had no internal derangement, meniscal tear, ligament or tendon problems. (R. at 577.) Dr. Burkhardt informed Plaintiff that there were no mechanical problems with her knees and, therefore, there was nothing further that he could do for her. (R. at 577.)

On July 13, 2011, Dr. Jessee completed a fibromyalgia RFC questionnaire. (R. at 570-71.) He diagnosed Plaintiff as having chronic fibromyalgia. (R. at 570.) He noted that Plaintiff's other medical problems included osteoarthritis in her knees, insomnia, cervical spondylosis, asthma and migraine headaches. (R. at 570.) Plaintiff's fibromyalgia symptoms included multiple tender points, nonrestorative sleep, chronic fatigue, muscular pain, joint pain, major depression, headaches and breathlessness. (R. at 570.) Precipitating factors included stress and movement or overuse. (R. at 570.) Dr. Jessee indicated that Plaintiff had chronic pain in her lumbrosacral spin, cervical spine, thoracic spine, both shoulders, both arms, both hands and all fingers, both hips, both legs, and both knees, ankles and feet, and that her pain constantly interfered with her attention and concentration. (R. at 570.)

Dr. Jessee opined that Plaintiff could not tolerate even low stress jobs, and she would be restricted to a job that permitted shifting positions at will from sitting standing or walking. (R. at 570.) Plaintiff could sit, stand and walk for about four hours total in a normal workday with normal breaks, and could never lift or carry any weight in a competitive work situation. (R. at

18

570.) She could never twist, stoop, bend, climb ladders or stairs, or crouch. (R. at 570.) In the workplace, Plaintiff should avoid all exposure to extreme cold, avoid concentrated exposure to extreme heat, moderately avoid high humidity, and need not avoid solvents and cleaners or soldering fluxes. (R. at 570.) Similarly, Plaintiff should avoid all exposure to cigarette smoke and hazards, avoid exposure to concentrated wetness, and moderately avoid exposure to fumes, odors, dusts and gasses. (R. at 570.) She should avoid all exposure to heights, but need not avoid noise, perfumes or chemicals. (R. at 570.) She could walk one city block without pausing to rest but did not need a cane to walk, and could sit for twenty minutes at a time. (R. at 570-71.)

Dr. Jessee indicated that Plaintiff would likely miss more than four days of work per month due to her fibromyalgia, and would need six fifteen-minute breaks during which she could lie down and six ten-minute periods in a normal work day during which she could stand or walk. (R. at 571.) Plaintiff did not need to elevate her legs while sitting, her ability to perform repetitive motions with her legs was rarely limited and her use of her arms for overhead work was unlimited. (R. at 571.) Dr. Jessee stated that Plaintiff could never grasp, push, pull, reach, or finger with either arm, had unlimited ability to hold her head in a static position and was rarely limited in her ability to look down, turn her head to the left or right, or look up. (R. at 571.) Dr. Jessee summarized Plaintiff's condition as severe fibromyalgia that prevented her from working, as well as osteoarthritis of the knees that prevented prolonged walking, bending, stooping, kneeling and climbing. (R. at 571.)

Plaintiff saw Dr. Jessee again on August 9, 2011, complaining of pain. (R. at 658-59.) Dr. Jessee opined that Plaintiff's fibromyalgia was getting worse and noted sixteen trigger points and no swollen or tender joints. (R. at 658.) Plaintiff's most recent lab results (from May 2011) were normal and showed no evidence of drug toxicity or rheumatoid arthritis. (R. at 659.)

19

Plaintiff's cervical spine x-rays revealed mild degenerative disc disease at C4-C5, but Dr. Jessee stated that he doubted that this caused Plaintiff's pain. (R. at 659.) Dr. Jessee ordered new x-rays of Plaintiff's sacroiliac joint, which were negative for ankyloses, lesions, transitional vertebra and significant spondylosis. (R. at 659, 661.) He noted that Plaintiff's anemia was resolved, increased her Ambien dosage to alleviate her insomnia and prescribed Lyrica. (R. at 659.)

In August 2011, Plaintiff returned to VPA for a follow-up appointment with Ms. Walters. (R. at 704.) Plaintiff stated that her mood was a little better on Abilify, but she was still irritable at times. (R. at 704.) Plaintiff appeared drowsy, but not depressed. (R. at 704.) Her affect remained constricted, but she appeared brighter than she had previously. (R. at 704.) She was oriented to all spheres, had goal-directed thought processes, normal speech, intact memory and good judgment and insight. (R. at 704.) Plaintiff's Abilify dosage was increased. (R. at 704.) On September 8, 2011, Plaintiff reported that her mood improved following the increase in Abilify. (R. at 703.) On examination, Plaintiff appeared depressed with constricted affect. (R. at 703.)

On September 21, 2011, Plaintiff began seeing Elizabeth Brill, LCP, Ph.D. at VPA for counseling. (R. at 674, 691.) Plaintiff complained of crying, getting upset, feeling like she was going to break down, drowsiness from her medications, and needing help with simple activities like washing her hair, eating, lifting, and walking down stairs. (R. at 691.) Plaintiff stated that she did not believe her knee pain was caused by fibromyalgia, and that her prescription pain patches made her anxious and made it difficult for her to think. (R. at 691.) She explained that her family did not seem to understand the extent of her physical issues, and her goals for therapy included feeling better about herself, stress management and pain management. (R. at 694.) Dr.

20

Brill diagnosed Plaintiff with major depression and generalized anxiety disorder ("GAD"). (R. at 694.)

On October 3, 2011, Plaintiff saw Dr. Taylor, complaining of extreme fatigue and excessive sleepiness that began three to four weeks earlier. (R. at 611.) Plaintiff stated that she fell asleep well and woke up twice each night, which was an improvement for her. (R. at 611.) Dr. Taylor performed a physical examination that revealed normal results. (R. at 613.) She ordered lab work to determine the cause of Plaintiff's fatigue and noted that it was likely multifactorial. (R. at 613.) Dr. Taylor instructed Plaintiff to try a new sleep regimen for three weeks and to follow-up if it was not helpful. (R. at 613.)

On October 13, 2011, Plaintiff saw Dr. Brill and stated that she was doing better and was trying to adjust to her situation. (R. at 688.) She continued to feel overwhelmed, but stated that going to church, going to her son's football games and visiting with friends and family made her feel better. (R. at 690.) Dr. Brill encouraged Plaintiff to focus on her breathing and to try using a white board to write reminders to herself. (R. at 689-90.) On October 27, 2011, Plaintiff followed-up with Ms. Walters and reported that she was feeling okay and was not experiencing severe lows. (R. at 702.) She rated her mood a seven out of ten. (R. at 702.) Plaintiff appeared fatigued, but her mood was euthymic and she was oriented to all spheres. (R. at 702.) Her thought process was goal directed, her thought content was intact, and her judgment and insight were good. (R. at 702.)

On November 21, 2011, Plaintiff returned for a follow-up with Dr. Jessee, complaining of constant bilateral pain that was a nine out of ten in severity in her fingers, elbows, neck, lower back, lateral hip, knees, ankle and feet. (R. at 654.) Plaintiff had less than thirty minutes of morning stiffness and stated that she had swelling in her knee joint and muscle pain in her upper

21

and lower back. (R. at 654.) Dr. Jessee noted that steroid tapers and trigger point injections had not been helpful, but that Plaintiff had experienced relief from Lyrica and Lidoderm patches. (R. at 654.) Plaintiff reported getting five hours of sleep per night and five hours during the day, and denied any depression, anxiety or suicidal thoughts. (R. at 655.) On examination, Plaintiff's DIP and carpometacarpal ("CMC") joints were normal, but her PIP and metacarpophalangeal ("MCP") joints were tender bilaterally. (R. at 655.) Her elbow, shoulder, hip, knee, ankle, tarsal, metatarsalphalangeal ("MTP") and toe joints were all normal bilaterally. (R. at 655.) Her cervical spine range of motion, lumbar spine and thoracic spine alignment were normal. (R. at 655.) Plaintiff had costochondral tenderness. (R. at 655.) Overall, Plaintiff had no swollen joints, nineteen tender joints and sixteen trigger points. (R. at 655.) Dr. Jessee assessed active fibromyalgia with multiple triggers, poor sleep patterns and depression. (R. at 655.) He continued Plaintiff's Lidoderm prescription and prescribed Lyrica. (R. at 656.)

On December 1, 2011, Plaintiff followed-up at VPA, complaining of problems with her fibromyalgia. (R. at 701.) She rated her mood a five out of ten, denied having suicidal thoughts or homicidal ideations, and indicated that her sleep varied. (R. at 701.) Plaintiff stated that she believed that she was on the right medications, but was having trouble affording them. (R. at 701.) Plaintiff appeared depressed, uncomfortable and in pain, and she walked with a cane. (R. at 701.) Her affect was constricted but her psychological evaluation indicated otherwise normal results. (R. at 701.)

On December 8, 2011, Plaintiff saw Dr. Brill and stated that she had been evicted and was very upset about it. (R. at 684.) She noted that money was tight, because she was not working and her husband could not find work. (R. at 684.) Plaintiff followed-up with Dr. Brill on January 5, 2012, and stated that she obtained a membership to the local YMCA and was

22

doing water aerobics classes and using the sauna three days per week. (R. at 675.) Plaintiff stated that she was also trying to walk at the gym, and would change her diet and attempt gentle yoga. (R. at 675.) During her January 25, 2012, appointment with Dr. Brill, Plaintiff complained of being tired and crying, as well as being unable to afford the co-pay for her appointment with Ms. Walters. (R. at 682.)

When Plaintiff saw Ms. Walters on February 2, 2012, she was very depressed. (R. at 700.) She could not afford groceries, was out of all of her medications, felt overwhelmed and appeared to be in pain. (R. at 700.) She was having trouble walking and indicated that she would be having knee surgery. (R. at 700.) Plaintiff was oriented to all spheres, her speech was monotone and her voice low, her mood depressed but without suicidal or homicidal thoughts, her affect was congruent but blunted, her thought process was goal-directed, her thought content was intact, her memory was normal and her insight and judgment were good. (R. at 700.) Plaintiff was given samples of her medications. (R. at 700.)

On February 29, 2012, Plaintiff returned for an appointment with Dr. Brill, complaining that she was still in a lot of back pain, but that she was doing better and that her medications were helping. (R. at 680.) She had switched to a new church and was attending weekly Sunday services and Wednesday night bible study meetings. (R. at 680.) Plaintiff stated that she was not sleeping well, and had gotten word search books to distract herself and help her to relax. (R. at 680.) Dr. Brill provided stress management information, and noted that Plaintiff could probably return to her hobby of crocheting. (R. at 680.)

Plaintiff reported feeling much better during her March 1, 2012 appointment with Ms. Walters. (R. at 699.) She was more involved in church and had her hair done. (R. at 699.) Plaintiff stated that her sleep varied and she continued to experience back and knee pain. (R. at

23

699.) On examination, Plaintiff appeared healthy, was oriented to all spheres, had normal speech, had constricted and congruent affect, and although she appeared depressed, she seemed better than she had been previously. (R. at 699.) Plaintiff's thoughts were goal-directed, her thought content and memory were intact, and her judgment and insight were good. (R. at 699.)

On March 12, 2012, Plaintiff returned to Dr. Taylor, complaining of spasms and lower back pain that began two months earlier. (R. at 622.) The pain did not radiate down Plaintiff's legs, and was not accompanied by numbness, tingling or weakness in her legs. (R. at 622.) Plaintiff indicated that standing, sitting, bending forwards and participating in water aerobics exacerbated her symptoms, whereas sleeping on her side alleviated them. (R. at 622.) Plaintiff also complained of dysuria, frequency, urgency, foul smelling urine and pain in her lower abdomen that began two weeks earlier. (R. at 622.) On examination, Plaintiff appeared to be in mild pain and had antalgic gait. (R. at 624.) Plaintiff had tenderness in her abdomen, lumbosacral spine at L1 through L5 and her lumbar spine and buttocks bilaterally. (R. at 624.) She had reduced lumbosacral range of motion and her straight leg raise test was negative at forty-five degrees bilaterally. (R. at 624.) Plaintiff's deep tendon reflexes, motor strength and sensation were normal bilaterally, including her heel and toe gait, and her peripheral pulses were palpable. (R. at 624.) Dr. Taylor assessed low back pain, abnormal urine odor, dysuria and fibromyalgia. (R. at 624.) She referred Plaintiff to physical therapy, prescribed Bactrim and ordered a urinalysis. (R. at 624.)

On April 3, 2012, Plaintiff returned for an appointment with Dr. Brill, complaining that she had a hard time sleeping because of her pain, had difficulty thinking and was tired all of the time, but forced herself to stay awake. (R. at 678.) Plaintiff stated that she was now taking Pristiq and Flexeril. (R. at 678.) Plaintiff stated that she could not stand in one place but was

24

walking at a local track, and could sit for fifteen to twenty minutes. (R. at 678.)  Dr. Brill noted

that Plaintiff's mood was frustrated and that although she did not feel happy overall, she was

happy a few times each day. (R. at 678-79.)  Plaintiff indicated that she was "kind of"

volunteering as a coach with the track team, providing verbal instruction. (R. at 679.)

On April 9, 2012, Plaintiff followed-up with Dr. Jessee, complaining of bilateral knee

pain. (R. at 633.)  Plaintiff reported muscle pain in her upper back and less than fifteen minutes

of morning stiffness. (R. at 633.)  On examination, Plaintiff's DIP, PIP and MCP joints were

abnormal, but her CMC joints, wrists, shoulders and hips were normal. (R. at 634.)  Plaintiff had

bilateral tenderness and swelling in her knee joints, but no crepitus. (R. at 634.)  Plaintiff's

ankles, tarsal, MTP and toe joints were normal. (R. at 634.)  Her cervical spine range of motion

and lumbar spine were normal, she had no epicondyle medial, lateral epicondyle, lateral

occipital, bicipital, subdeltoid or supraspinatus trigger points. (R. at 634.)  Plaintiff had trigger

points bilaterally in her trapezius, interscapular, sacroiliac, trochanter tendon, pes anserinus

tendon and Achilles tendon. (R. at 634.)  Dr. Jessee also observed 1+ pitting edema in Plaintiff's

ankle. (R. at 634.)  Dr. Jessee opined that fibromyalgia was the likely cause of Plaintiff's knee

pain and ordered x-rays of both knees, which showed no abnormalities. (R. at 634-35, 638-40.)

He also instructed Plaintiff to return to VPA to discuss stopping her Pristiq prescription and

starting Savella. (R. at 635.)

On April 26, 2012, Plaintiff returned for an appointment with Dr. Brill. (R. at 677.)  She

stated that she had started taking Savella for chronic pain and depression, and was trying to keep

things moving with her treatment. (R. at 677.)  She tried electric shock therapy for her knees but

could not tolerate it. (R. at 677.)  Plaintiff was still walking, but said that she could not stoop or

bend. (R. at 677.)

On May 2, 2012, Plaintiff followed-up at VPA. (R. at 698.) Plaintiff stated that she was taking Savella and that it helped somewhat, but she still had a lot of pain. (R. at 698.) She had an equal number of good and bad days and was sleeping well, although her energy was decreased. (R. at 698.) Plaintiff was very tired that day and continued to use a cane. (R. at 698.) On examination, Plaintiff appeared well-groomed, relaxed and oriented to all spheres. (R. at 698.) Plaintiff had normal speech, depressed mood, no suicidal or homicidal ideations and congruent and constricted affect. (R. at 698.) Her thought process was goal-directed and its content intact, her memory was normal and her judgment and insight were good. (R. at 698.) She was diagnosed with major depression and fibromyalgia and continued on her Abilify and Savella prescriptions. (R. at 698.)

On June 29, 2012, Dr. Brill completed a Mental Impairment Questionnaire ("MIQ") evaluating Plaintiff's mental impairments. (R. at 608-09.) Dr. Brill opined that Plaintiff's Axis I issues included listings 293.83 (mood disorder due to another medical condition) and 300.02 (generalized anxiety disorder), that she had no Axis II issues, that her Axis III impairments included fibromyalgia, chronic pain, migraine headaches and asthma, that her Axis IV issues included financial hardship and sharing a small living space with her family, that her Axis V was a 45, her current GAF score was a 45, and that her highest GAF score within the past year was a 51. (R. at 608.) Dr. Brill did not indicate a prognosis. (R. at 608.) Dr. Brill checked the following boxes with regards to Plaintiff's symptoms: Anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; persistent disturbances of mood or affect; disorientation

26

to time and place; motor tension; emotional lability; easy distractibility; sleep disturbance; and, short, intermediate or long term memory impairment. (R. at 608.)

Dr. Brill also rated Plaintiff's mental and emotional capabilities as part of the MIQ. (R. at 608-09.) She assessed Plaintiff as having a poor ability to: remember work-like procedures; maintain attention for a two-hour period; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; deal with normal work stress; understand, remember and carry out detailed instructions; deal with stress of semiskilled and skilled work; travel in unfamiliar places; and, use public transportation. (R. at 608-09.) Dr. Brill assessed Plaintiff as having fair ability to: understand, remember and carry out very short and simple instructions; maintain regular attendance and be punctual; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; be aware of normal hazards and take appropriate precautions; set realistic goals or make plans independently of others; interact appropriately with the general public; maintain socially acceptable behavior; and, adhere to basic standards of neatness and cleanliness. (R. at 608-09.) Dr. Brill rated Plaintiff as having a good ability to ask simple questions or request assistance, as well as get along with co-workers or peers. (R. at 609.)

Dr. Brill opined that Plaintiff had marked limitations regarding difficulties in maintaining social functioning, and extreme limitations with regard to her activities of daily living and deficiencies of concentration, persistence or pace. (R. at 609.) She also indicated that Plaintiff had four or more repeated episodes of decompensation within a twelve-month period, each

27

lasting at least two weeks. (R. at 609.) Further, Dr. Brill noted that Plaintiff had a medically documented history of a chronic organic mental or affective disorder of at least two years' duration that caused more than a minimal limitation to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, as well as a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. (R. at 609.) She reported that Plaintiff's symptoms were severe enough to constantly interfere with her attention and concentration. (R. at 609.) Dr. Brill summarized Plaintiff's condition at the end of the MIQ form, stating that she suffered from "medical conditions including severe fibromyalgia, severe migraines, etc. that have resulted in chronic pain leading to Major Depression and Generalized Anxiety. She is very emotionally distraught by her situation and has attended therapy as much as possible to participate in her treatment." (R. at 609.)[3]

C. State Agency Physicians

On February 16, 2011, William Amos, M.D., a state agency physician, reviewed Plaintiff's medical records and completed a Disability Determination Explanation. (R. at 68-77.) Dr. Amos concluded that Plaintiff had the severe medically determinable impairments ("MDIs") of muscle, ligament and fascia disorders, inflammatory arthritis, osteoarthrosis and allied disorders, inflammatory bowel disease and fibromyalgia, and the non-severe medically determinable impairments of asthma and deficiency anemias. (R. at 72.) He opined that

---

[3]     On November 19, 2012, Plaintiff submitted a letter from Dr. Brill to the Appeals Council regarding Plaintiff's mental status examination on November 15, 2012. (R. at 710.) Because Dr. Brill performed this assessment after the ALJ issued her decision denying benefits, it occurred outside of the relevant period for purposes of this appeal. *See* 20 C.F.R. §§ 404.620(a)(2), 416.330 (stating that an application for benefits remains in effect until an ALJ issues a hearing decision).

28

Plaintiff's impairments could reasonably be expected to produce her pain and other symptoms, but her statements about the intensity, persistence, and functionally limiting effects of her symptoms were "not entirely credible." (R. at 72-73.) Dr. Amos determined that Plaintiff had exertional limitations due to diffuse pain and difficulty walking or standing for long periods of time without her cane. (R. at 73.) Plaintiff could carry twenty pounds occasionally and ten pounds frequently, sit, stand or walk for six hours in an eight-hour workday with normal breaks and must periodically alternate sitting and standing to relieve pain and discomfort. (R. at 73.) Plaintiff's ability to push or pull, including the operation of hand or foot controls, was unlimited. (R. at 73.)

Dr. Amos further determined that Plaintiff had postural limitations due to her diffuse pain. (R. at 74.) She could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffold, occasionally balance, and occasionally stoop, kneel, crouch and crawl. (R. at 74.) Plaintiff also had some environmental limitations on account of her asthma and use of a cane, such that she should avoid concentrated exposure to wetness, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards. (R. at 74.) Her ability to be exposed to extreme cold and extreme heat, humidity and noise were unlimited. (R. at 74.) Based on these considerations, Dr. Amos concluded that Plaintiff could perform a limited range of light work. (R. at 75.)

On August 11, 2011, David C. Williams, M.D., a state agency physician, completed a Disability Determination Explanation. (R. at 97-113.) Dr. Williams determined that Plaintiff had the severe MDIs of muscle, ligament and fascia disorders, inflammatory arthritis, osteoarthritis and allied disorders, inflammatory bowel disease, fibromyalgia and affective disorders, as well as the non-severe MDIs of asthma and deficiency anemias. (R. at 105.) He concluded that Plaintiff's MDIs could reasonably be expected to produce her pain or other

symptoms. (R. at 106.) However, Dr. Williams opined that Plaintiff's statements about the persistence, severity and functional limitations of her symptoms were only partially credible. (R. at 106-07.)

Dr. Williams assessed Plaintiff as having exertional limitations due to diffuse pain and difficulty walking or standing for long periods without her cane. (R. at 107.) Dr. Williams determined that Plaintiff had the ability to lift twenty pounds occasionally and ten pounds frequently, and to sit, stand or walk for approximately six hours in an eight-hour workday with normal breaks, although she would require the option to periodically alternate sitting and standing to relieve pain and discomfort. (R. at 107.) Plaintiff's postural limitations included the ability to climb ramps and stairs frequently and ladders, ropes and scaffolds occasionally, as well as occasionally balancing, stooping, kneeling, crouching and crawling. (R. at 108.) Dr. Williams assessed no manipulative, visual, or communicative limitations. (R. at 108.) Plaintiff had to avoid concentrated exposure to wetness, vibration, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 108-09.) Dr. Williams determined that Plaintiff could have unlimited exposure to extreme cold, extreme heat, humidity and noise. (R. at 108.) Ultimately, Dr. Williams agreed with Dr. Amos's assessment that Plaintiff was capable of performing light work with limitations. (R. at 109.)

Also included in the August 2011 Disability Determination Explanation was an assessment of Plaintiff's mental impairments and mental RFC by Alan D. Entin, Ph. D., a state agency psychologist. (R. at 105-06, 109-10.) Dr. Entin considered whether Plaintiff satisfied the requirements of listing 12.04-Affective Disorders and determined that although Plaintiff had an MDI, the medical evidence did not establish the "A" criteria of the listing. (R. at 105.) Next, Dr. Entin determined that Plaintiff had mild restriction in her activities of daily living ("ADLs"),

mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (R. at 106.) Therefore, Dr. Entin concluded that the "B" criteria of the listing were unsatisfied. (R. at 105-06.) Finally, Dr. Entin determined that the "C" criteria of the listing were not satisfied. (R. at 106.) Thus, Plaintiff did not meet or medically equal listing 12.04. (R. at 106.)

Dr. Entin assessed Plaintiff's mental RFC and determined that Plaintiff had understanding and memory limitations. (R. at 109.) Specifically, Dr. Entin concluded that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or her ability to understand and remember very short and simple instructions, but was moderately limited in her ability to understand and remember detailed instructions due to depression. (R. at 109.) Additionally, Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods due to depression. (R. at 110.) She was not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, or make simple work-related decisions. (R. at 109-10.) Plaintiff had neither social interaction nor adaptation limitations. (R. at 110.)

D. Hearing Testimony

On September 6, 2012, Plaintiff (represented by counsel) testified during a hearing held before the ALJ. (R. at 35-48.) Plaintiff was forty-three years old and had attended three years of

31

college. (R. at 36.) She lived with her three teenaged children and her husband in an efficiency apartment. (R. at 37.) Her husband worked, her eldest child was in college and her middle child was in school. (R. at 38.) She had previously worked as a special education instructional assistant in a school, in retail and as a teacher's assistant in a daycare. (R. at 36.) As an instructional assistant, Plaintiff often had to restrain children and lift them onto or off of objects in the classroom. (R. at 37.) These children sometimes weighed more than fifty pounds. (R. at 37.) She also lifted books, equipment, and computers on a daily basis, and typically stood or walked for approximately five to six hours during a seven-and-a-half-hour day. (R. at 39-40.) At the time of the hearing, Plaintiff stated that she was not receiving any income or unemployment, just disability from her instructional assistant job. (R. at 37.)

Plaintiff stated that she had pain in her neck, shoulders, elbows, fingers, lower back, hips, knees, ankles and feet, and that Dr. Jessee had told her that her pain was caused by fibromyalgia. (R. at 40.) In June 2010, Plaintiff saw a neurologist, an orthopedist and her primary care physician regarding pain in numerous parts of her body, including sharp pain radiating from the back of her neck through her head and pain and fluid in her knees. (R. at 40.) Plaintiff had experienced similar pain for the previous two and a half years, and it continued to worsen over time. (R. at 40-41.) In the month before Plaintiff left her job on June 22, 2010, she sustained several injuries from the children in her class. (R. at 41.) She left because of these injuries, as well as because she was falling asleep in the classroom. (R. at 41.) She did not return to work that Fall because of her knee problems and upper body pain. (R. at 41.)

Plaintiff testified that she could not lift and carry a gallon of milk, because her fingers would cramp up or her elbow would hurt. (R. at 41.) During a bad day, Plaintiff could only sit for twenty to twenty-five minutes at a time for a total of one hour during an eight-hour workday.

(R. at 42.)  During a good day, Plaintiff could sit for twenty-five to thirty-five minutes at a time and for a total of two to three hours during an eight-hour workday.  (R. at 42.)  She attended church twice per month.  (R. at 42-43.)  Plaintiff verbally coached her son in track and field while he was in high school.  (R. at 43-44.)  Plaintiff's husband cared for their children to the extent that they needed assistance, and sometimes Plaintiff's mother assisted.  (R. at 44.)  Plaintiff stated that she could no longer cook for them, take them places, do dishes or iron and wash their clothes.  (R. at 44-45.)  Plaintiff relied on her children to do many of these activities for themselves.  (R. at 45.)  She worried about them becoming disobedient and talked to her therapist about this concern.  (R. at 44-45.)  Plaintiff testified that she did not participate in any hobby activities and did no yard work or housework.  (R. at 47-48.)

Plaintiff stated that she and her family had moved to their efficiency apartment in December 2011, and that she had been unable to help with the move because she was too tired. (R. at 46.)  She explained that she had to try and stay awake to make sure her children packed boxes.  (R. at 46.)  Plaintiff stated that she had gained a significant amount of weight in the previous year, going from around one hundred seventy pounds to two hundred and eight pounds. (R. at 47.)  Plaintiff blamed her weight gain on stress and her steroid medications.  (R. at 47.)  As of the hearing, Plaintiff took ProAir for her asthma, Savella for depression, pain and fibromyalgia, Cyclobenzaprine for migraine headaches, Lidoderm patches for pain and Flexeril for pain.  (R. at 47.)

## II.    PROCEDURAL HISTORY

On September 3, 2010, Plaintiff filed for DIB and SSI, alleging an onset date of June 22, 2010.  (R. at 12, 181.)  Plaintiff sought disability due to anemia, arthritis, asthma, fibromyalgia and migraine headaches.  (R. at 200.)  Plaintiff's claims were denied initially on February 16,

33

2011, and upon reconsideration on August 12, 2011. (R. at 12.)  On August 25, 2011, Plaintiff

filed a written request for a hearing. (R. at 12.)  On September 6, 2012, Plaintiff, represented by

counsel, testified before the ALJ during a hearing. (R. at 12.)  On September 21, 2012, the ALJ

issued a written decision denying Plaintiff's claims. (R. at 12-25.)  On January 30, 2014, the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final

decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

### III.    QUESTIONS PRESENTED

1. Did the ALJ err in assigning little weight to Dr. Jessee's opinion?

2. Did the ALJ err in assigning little weight to Dr. Brill's opinion?

3. Did the ALJ err in assigning some weight to the state agency physicians' opinions?

4. Did the ALJ err in assessing Plaintiff's credibility?

5. Did the ALJ err in formulating Plaintiff's RFC?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether substantial evidence in the record supports the Commissioner's decision

and whether the proper legal standards were applied in evaluating the evidence. *Hancock v.*

*Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)).  Substantial evidence is more than a scintilla but less than a preponderance, and is

the kind of relevant evidence that a reasonable mind could accept as adequate to support a

conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*,

402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a

whole, but may not "undertake to re-weigh conflicting evidence, make credibility

34

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir.

2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based

on the record as a whole, the Court must "take into account whatever in the record fairly detracts

from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks

omitted). The Commissioner's findings as to any fact, if substantial evidence in the record

supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation

omitted). Although the standard is high, if substantial evidence in the record does not support

the ALJ's determination or if the ALJ has made an error of law, the district court must reverse

the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro*, 270 F.3d at 177.

An ALJ conducts the analysis for the Commissioner, and a court must examine that process on

appeal to determine whether the ALJ applied the correct legal standards and whether substantial

evidence on the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at

176-77.

The first step in the sequence is to determine whether the claimant was working at the

time of the application and, if so, whether the work constituted SGA. 20 C.F.R. §§ 404.1520(b),

416.920(b). SGA is work that is both substantial and gainful as defined by the Social Security

Administration in the Code of Federal Regulations. Substantial work activity is "work activity

that involves doing significant physical or mental activities. Your work may be substantial even

if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than

when you worked before." 20 C.F.R. §§ 404.1572(a), 416.972(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. §§ 404.1572(b), 416.972(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. §§ 404.1572(c), 416.972(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as a severe impairment entitling one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. §§ 404.1520(c), 416.920(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) that lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to her past relevant work[4] based on an assessment of the claimant's RFC[5] and the "physical and mental demands of work [the claimant] has done in

---

[4]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[5]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to

36

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant can perform other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. 20 C.F.R. §§ 404.1560, 416.960. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

---

perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

## V.    ANALYSIS

A. The ALJ's Decision

On September 6, 2012, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 32-55.) On September 21, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 12-25.) The ALJ followed the five-step sequential evaluation as established by the Act in analyzing whether Plaintiff was disabled. (R. at 14-25.)

At step one, the ALJ found that Plaintiff had not engaged in SGA since her alleged onset date. (R. at 14.) At step two, the ALJ determined that Plaintiff suffered from the severe impairments of fibromyalgia, major depression, inflammatory arthritis, asthma, osteoarthritis and migraine headaches. (R. at 14.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ further determined that Plaintiff had the RFC to perform a full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the limitations that she use a cane for prolonged walking and standing, frequently climb ramps and stairs but never climb ladders, ropes or scaffolds, only occasionally balance, stoop, kneel and crouch, and avoid concentrated exposure to wetness, vibration, fumes, odors, dusts, gases, other pulmonary irritants, unprotected heights and hazardous machinery. (R. at 17.) Further, the ALJ limited Plaintiff to simple, routine work requiring an understanding of simple instructions due to her psychological symptoms and the side effects of her medications. (R. at 17.)

At step four, the ALJ concluded that Plaintiff could not perform her past relevant work as an instructional assistant or in retail sales. (R. at 23.) Finally, at step five, based upon Plaintiff's

age, education, work experience and RFC, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 24.) Accordingly, the ALJ found that Plaintiff was not disabled under the Act. (R. at 24-25.)

Plaintiff challenges the ALJ's decision on five grounds. First, Plaintiff argues that the ALJ erred in giving little weight to Dr. Jessee's opinion. (Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13-1) at 13-18.) Second, Plaintiff claims that the ALJ erred in giving little weight to Dr. Brill's opinion. (Pl.'s Mem. at 18-21.) Third, Plaintiff asserts that the ALJ erred in affording some weight to the state agency consultants' opinions. (Pl.'s Mem. at 21-22.) Fourth, Plaintiff contends that the ALJ erred in diminishing Plaintiff's credibility. (Pl.'s Mem. at 22-27.) Finally, Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC. (Pl.'s Mem. at 27-28.) Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 15) at 11-25.)

A. Substantial evidence supports the ALJ's decisions in affording weight to certain medical opinions.

Plaintiff argues that the ALJ erred in giving little weight to Dr. Jessee's opinion and to Dr. Brill's opinion, as well as in assigning some weight to the state agency physicians' opinions. (Pl.'s Mem. at 13-22.) Defendant responds that substantial evidence supports the ALJ's determinations. (Def.'s Mem. at 11-25.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 416.912(a)-(e); 20 C.F.R. §§ 404.1527, 416.927. When the record

39

contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are internally inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinions: (1) the length of the treating relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

40

Unless the ALJ gives the treating source's opinion controlling weight, she must explain in her decision the weight that she gave to opinions from treating sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "If the ALJ does not give the treating physician's opinion controlling weight, she must 'give good reasons in [her] notice of determination or decision for the weight [she] give[s] [the] treating source's opinion.'" *Russell v. Comm'r of Soc. Sec.*, 440 F. App'x 163, 164 (4th Cir. 2011) (unpublished) (quoting 20 C.F.R. § 404.1527(c)(2)).[6] Determining the specific weight of medical opinions is particularly important because if there is any inconsistency between the opinions, the regulations require a comparative analysis of the competing medical opinions. *See, e.g.*, 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [plaintiff] than to the opinion of a source who has not examined [plaintiff].")

    1.  The ALJ did not err in assigning little weight to Dr. Jessee's opinion.

Plaintiff argues that the ALJ erred in rejecting the opinions of Plaintiff's treating rheumatologist, Dr. Jessee, as extreme and unsupported by the longitudinal medical record. (Pl.'s Mem. at 13-18.) Defendant counters that substantial evidence supports the ALJ's decision to afford little weight to Dr. Jessee's opinions. (Def.'s Mem. at 11-16.)

In this case, the ALJ was forced to reconcile and assign weight to the divergent medical opinions of Plaintiff's treating physicians, Dr. Jessee and Dr. Burkhardt, and the opinions of Dr. Amos and Dr. Williams, the state agency physicians. The ALJ did not completely reject Dr. Jessee's opinion, but rather afforded it little weight, because the limitations that Dr. Jessee expressed in his assessment were inconsistent with Plaintiff's medical evidence as a whole. (R. at 22.) Substantial evidence supports the ALJ's decision.

---

[6]    The Fourth Circuit cited to an earlier version of this regulation. This citation is to the current version of the regulation, which has been renumbered but not substantively changed.

41

Dr. Jessee treated Plaintiff for fibromyalgia between April 12, 2011, and April 23, 2012. (R. at 555-567, 570-571, 630-673.) On July 13, 2011, Dr. Jessee completed a fibromyalgia RFC assessment for Plaintiff. (R. at 570-71.) He opined that Plaintiff suffered from severe fibromyalgia that prevented her from working. (R. at 570-71.) Plaintiff's condition caused her chronic pain in her lumbrosacral spine, cervical spine, thoracic spine, both shoulders, arms, hands and all fingers, hips, legs, knees and ankles, and her pain constantly interfered with her attention and concentration. (R. at 570.) Dr. Jessee opined that Plaintiff could not tolerate even low-stress jobs, was restricted to a job which permitted shifting positions from standing to sitting at will, could only stand, sit and walk for four hours in a normal workday and could never lift or carry any weight. (R. at 570.) Plaintiff could never twist, stoop, bend, crouch or climb ladders or stairs. (R. at 570.) She must avoid exposure to extreme cold, cigarette smoke, heights and hazards entirely, avoid concentrated exposure to extreme heat and wetness, and moderately avoid high humidity, fumes, odors, gasses and dusts. (R. at 570.) Finally, Dr. Jessee opined that Plaintiff would likely miss more than four days of work per month and would need six fifteen-minute breaks during which she could lie down and six ten-minute periods of walking and/or standing in a normal workday. (R. at 571.) Additionally, he noted that Plaintiff suffered from knee osteoarthritis that prevented her from prolonged walking, bending, stooping, kneeling and climbing. (R. at 571.)

Plaintiff's medical records support the ALJ's determination. In June 2010, Dr. Mathe, a neurologist, examined Plaintiff and observed full motor and strength in Plaintiff's arms and legs. (R. at 381.) Indeed, Plaintiff regularly demonstrated between fair and full motor strength in major muscle groups on examination. (R. at 325, 381, 578, 582-83, 624.) In August 2010, Dr. Esway, Plaintiff's ankle specialist, reported that Plaintiff had less tenderness and swelling, but

that her reactions on examination appeared disproportionate to his objective findings. (R. at 326.) Dr. Esway also opined that he found it strange that Plaintiff denied that the fracture boot, Prednisone pack and lace-up brace provided her any symptom relief. (R. at 326.) In September 2010, Plaintiff told Dr. Burkhardt that her right knee had improved from using the patellofemoral stabilization brace. (R. at 325.) In January 2011, Plaintiff acknowledged experiencing significant pain relief from her September 2010 Cortisone shots. (R. at 583.) Recognizing that the knee injections alleviated Plaintiff's pain, Dr. Jessee instructed her to return to Dr. Burkhardt for additional shots. (R. at 663.) In November 2011, Dr. Jessee acknowledged that Lidoderm patches and Lyrica also mitigated Plaintiff's pain symptoms. (R. at 654.)

The treatment notes and opinion of Plaintiff's treating orthopedist, Dr. Burkhardt, support the ALJ's determination. Dr. Burkhardt treated Plaintiff for her knee pain from June 23, 2010, until July 13, 2011. (R. at 325-28, 577-83.) Dr. Burkhardt's routine examinations of Plaintiff's knees, as well as diagnostic images of her knees, yielded unremarkable results. (R. at 325, 328, 578, 582-83.) Dr. Burkhardt opined that Plaintiff's knee pain was not caused by mechanical knee problems. (R. at 577.) When asked by another doctor for his assessment of Plaintiff's abilities, Dr. Burkhardt stated that he believed that Plaintiff "was not totally disabled from doing any kind of work" and could "certainly be qualified to do sedentary-type work." (R. at 580.) Although the determination of Plaintiff's RFC is reserved for the Commissioner, Dr. Burkhardt's assessment of Plaintiff's work-related abilities stands in sharp contrast to Dr. Jessee's assessment that Plaintiff was totally disabled.

The opinions of the state agency physicians, Dr. Amos and Dr. Williams, further support the ALJ's decision to afford little weight to Dr. Jessee's opinions. In February 2011, Dr. Amos reviewed Plaintiff's medical evidence of record and determined that she was capable of

performing a limited range of light work. (R. at 75.) In his assessment, Dr. Amos noted that Plaintiff had exertional limitations due to diffuse pain and difficulty walking or standing for long periods of time without the use of a cane. (R. at 73.) Plaintiff could carry twenty pounds occasionally and ten pounds frequently, sit, stand or walk for six hours in an eight-hour workday with normal breaks and must periodically alternate sitting and standing to relieve pain and discomfort. (R. at 73.) Dr. Amos also determined that Plaintiff had postural and environmental limitations regarding her ability to climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch, crawl, as well as her ability to be exposed to wetness, vibrations, fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 74.)

In his August 2011 assessment at the reconsideration level, Dr. Williams considered Plaintiff's medical evidence and agreed with Dr. Amos regarding Plaintiff's exertional, postural and environmental limitations. (R. at 107-09.) Like Dr. Amos, Dr. Williams concluded that Plaintiff could perform a limited range of light work. (R. at 109.) Therefore, substantial evidence supports the ALJ's decision to afford little weight to Dr. Jessee's opinion regarding Plaintiff's limitations.

2. The ALJ did not err by giving little weight to the opinion of Dr. Brill.

Next, Plaintiff argues that the ALJ erred in giving little weight to the opinion of Plaintiff's treating psychologist, Dr. Brill, as expressed on a check-box form. (Pl.'s Mem. at 18-21.) Defendant responds that substantial evidence supports the ALJ's decision to afford little weight to Dr. Brill's opinion. (Def.'s Mem. at 16-19.)

In this case, the ALJ did not completely reject Dr. Brill's opinion, but rather assigned it little weight on the basis that the extreme limitations expressed were inconsistent with Plaintiff's longitudinal medical record, specifically Plaintiff's course of treatment and the treatment notes

and objective medical findings of mental health professionals. (R. at 23.) In her assessment, Dr. Brill opined that Plaintiff had extreme difficulties with ADLs and deficiencies of concentration, persistence or pace, as well as four or more episodes of decompensation, each of extended duration. (R. at 609.) Dr. Brill indicated that Plaintiff's mental and emotional capabilities were degraded in many areas relevant to her ability to work. (R. at 608-09.)

Plaintiff's medical records indicate that, although Plaintiff did suffer from mental health problems, her treatment during the relevant period was conservative, consisting of once-per-month appointments with Ms. Walters to review her medications and counseling sessions with Dr. Brill. (R. at 549-53, 674-94, 697-707.) At no point during the relevant period was Plaintiff hospitalized as a result of her psychiatric conditions, nor did she receive inpatient treatment. This conservative course of treatment is at odds with Dr. Brill's assessment.

Dr. Brill's and Ms. Walter's treatment notes further support the ALJ's decision to afford Dr. Brill's assessment little weight. In March 2011, Ms. Walters assessed Plaintiff as having a GAF score of 60, which just barely crosses the threshold from "mild" into "moderate" symptoms or difficulty in social, occupational or school functioning. (R. at 553.) During her office visits, Plaintiff routinely appeared healthy and relaxed. (R. at 550, 553, 698-700.) Although Plaintiff's mood was typically depressed and her affect congruent and constricted, she had no suicidal or homicidal ideations. (R. at 549-50, 698-705, 707.) Her speech was normal, her thought content intact and her thought process goal-directed, her memory was normal and her insight and judgment were good. (R. at 549-50, 699, 701-05, 707.) Although Plaintiff described some difficulties with ADLs, her complaints did not approach the severity indicated by Dr. Brill's assessment of Plaintiff's limitations. (R. at 688-91, 698, 700, 702.) Furthermore, Plaintiff often

reported during her appointments that her emotional state was improving. (R. at 549, 680, 688, 698-99, 702-04, 707.)

In August 2011, state agency psychologist Dr. Entin reviewed and considered Plaintiff's medical records and determined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workday and workweek uninterrupted by psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods due to her depression. (R. at 109-10.) Plaintiff was not significantly limited in her ability to understand, remember and carry out short and simple instructions, remember locations and work-like procedures, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them or make simple, work-related decisions. (R. at 109-10.) Such limitations significantly undermine Dr. Brill's assessment. Therefore, substantial evidence supports the ALJ's decision to assign little weight to Dr. Brill's opinion.

3. The ALJ did not err in the weight afforded to the state agency physicians' opinions.

Plaintiff argues that the ALJ's decision to accept and give some weight to the opinions of Dr. Amos and Dr. Williams was unsupported by substantial evidence, because they did not personally examine Plaintiff and their opinions were contradicted by other medical evidence in the record. (Pl.'s Mem. at 21-22; Pl.'s Reply Br. ("Pl.'s Reply") (ECF No. 16) at 5.) Defendant counters that the ALJ's decision to accept and weigh these opinions was supported by substantial evidence. (Def.'s Mem. at 11-12, 19.)

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).

Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as she would for any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). Except when a treating source's opinion is afforded controlling weight, the ALJ must "explain in the decision the weight given to the opinions of a [s]tate agency medical . . . consultant . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii).

In this case, the ALJ did not afford a treating source controlling weight. The ALJ acknowledged the expertise of the state agency physicians in evaluating Social Security disability claims such as Plaintiff's, and noted that Dr. Amos and Dr. Williams both determined that Plaintiff was capable of performing less than a full range of light work based on the evidence in the record. (R. at 23.) The ALJ stated that she considered their assessments and gave them some weight in formulating her opinion, but that she incorporated additional restrictions beyond those assessed by Drs. Amos and Williams into her RFC assessment. (R. at 23.)

Plaintiff's treatment records and imaging reports support the ALJ's determination. Plaintiff frequently reported improvements in her mood to her mental health treatment providers. (R. at 549, 680, 688, 699, 702-04, 707.) Plaintiff regularly demonstrated between fair and full muscle strength on examination. (R. at 325, 381, 578, 582-83, 624.) She frequently exhibited normal range of motion in the major joints in her extremities, including her knees, elbows and wrists. (R. at 325, 328, 394, 578, 582-83.) X-rays and MRIs showed what Dr. Burkhardt described as "remarkably good knees," with the only observable knee abnormality being Plaintiff's bilateral slightly lateral riding patellae. (R. at 328, 577-78, 635, 638-40.) X-rays of

47

Plaintiff's left shoulder, hands and ankles were unremarkable. (R. at 379, 403-04.) Plaintiff's March 2011 cervical spine x-ray was normal, and Dr. Jessee opined in August 2011 that although her most recent x-ray showed mild DDD at C4-C5, he did not believe that this was the cause of Plaintiff's pain. (R. at 449, 659.) In May 2011, Plaintiff's lumbar spine appeared normal, and her thoracic spine showed some DDD. (R. at 566-67.) Images of Plaintiff's SI joint were negative for ankyloses, lesions, transitional vertebra and significant spondylosis. (R. at 659, 661.)

Plaintiff's own statements provide further support for the ALJ's decision. Despite her physical and mental problems, Plaintiff attended church regularly. (R. at 42-43, 680, 690.) At her local YMCA club, Plaintiff participated in water aerobics, used the sauna and walked. (R. at 675, 677-78.) Plaintiff verbally coached the track team, attended her son's football games, and visited with family and friends. (R. at 43-44, 679, 690.) Thus, substantial evidence supports the ALJ's decision to afford some weight to the opinions of the state agency physicians.

B. The ALJ did not err in determining Plaintiff's credibility.

Plaintiff argues that the ALJ erred in diminishing Plaintiff's credibility on the basis that her allegations about the limiting effects of her symptoms were undermined by her treatment records. (Pl.'s Mem. at 22-27.) Defendant counters that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 20-24.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the

claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant medical evidence in the record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 10011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to the alleged symptoms; however, Plaintiff's claims as to the intensity, persistence and limiting effects were not credible to the extent that they were inconsistent with the ALJ's RFC determination. (R. at 18.) Substantial evidence supports the ALJ's decision.

Plaintiff's medical records support the ALJ's determination as to Plaintiff's credibility. The record contains numerous examples of Plaintiff's ability to function beyond her self-professed limitations. Despite Plaintiff's alleged inability to care for herself, treatment providers noted that she appeared well-groomed. (R. at 550, 553, 698, 707.) Objective medical evidence, such as x-rays and MRIs, was uniformly negative for significant physical problems. (R. at 328, 379, 402-04, 566, 577-78, 635, 638-40, 659.) During physical examinations, Plaintiff routinely had normal motor strength in all muscles tested. (R. at 325, 381, 578, 582-83, 624.) Plaintiff regularly demonstrated full range of motion in her knees. (R. at 325, 328, 578, 582-83.)

Both Dr. Esway and Dr. Burkhardt remarked that Plaintiff demonstrated hypersensitivity to touch around her knees and ankles despite her relatively mild physical issues. (R. at 325-26, 582.) Dr. Esway specifically noted that Plaintiff's description of her lack of improvement following treatment, as well as her reaction to clinical examination, seemed disproportionate to his objective clinical findings. (R. at 326.) Dr. Burkhardt's opinion that Plaintiff could perform

sedentary work, though not entitled to special deference, is nevertheless indicative of his assessment of Plaintiff's physical limitations based on his treatment of Plaintiff. (R. at 580.)

Similarly, Plaintiff's own statements — both to treatment providers and made during her hearing before the ALJ — support the ALJ's credibility determination. Plaintiff frequently noted that her mood and outlook were improving with medication. (R. at 549, 680, 688, 699, 702-04, 707.) Pain medications and injections were somewhat helpful in alleviating her pain. (R. at 582-83, 654, 698.) She joined a local YMCA club, where she participated in water aerobics and used the sauna three times per week. (R. at 675.) Plaintiff also walked at the YMCA. (R. at 675, 677-78.) Plaintiff attended church and tried to attend weekly bible study during the week when she could. (R. at 16, 42-43, 690, 699.) Plaintiff attended her son's football games and coached him in track. (R. at 43-44, 679, 690.) She spent time with family and friends. (R. at 690.)

Finally, the opinions of the state agency physicians support the ALJ's assessment of Plaintiff's credibility. In his February 16, 2011 report, Dr. Amos found that although Plaintiff's impairments could reasonably be expected to produce her pain and other symptoms, her statements about the intensity, persistence and functionally limiting effects of her symptoms were "not entirely credible." (R. at 72-73.) Dr. Williams agreed with Dr. Amos in his August 11, 2011 report, noting that he found Plaintiff's statements about the limiting effects of her symptoms only partially credible. (R. at 106-07.) Therefore, substantial evidence supports the ALJ's finding regarding Plaintiff's credibility.

C. The ALJ did not err in assessing Plaintiff's RFC.

Plaintiff asserts that the ALJ's assessment of Plaintiff's RFC is unsupported by substantial evidence, because it is unsupported by a step-by-step narrative discussion of the evidence on which it is predicated, does not indicate Plaintiff's ability to perform certain

functions and does not include any reference to the maximum amount of each work-related activity that Plaintiff could do based on the evidence. (Pl.'s Mem. at 27.) Defendant counters that the ALJ's RFC assessment is supported by substantial evidence. (Def.'s Mem. at 20-25.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.902(e)-(f), 416.945.(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 416.945(b). Generally, the claimant is responsible for providing the evidence that the ALJ utilizes in making her RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 416.945(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are based on the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).

The ALJ stated that after considering all of Plaintiff's physical and mental impairments, she found that Plaintiff retained the RFC to perform sedentary work with additional physical, postural, environmental and mental limitations. (R. at 17.) Specifically, the ALJ concluded that Plaintiff must use a cane for prolonged walking and standing, never climb ladders, ropes or scaffolds, only occasionally balance, stoop, kneel and crouch, and avoid concentrated exposure to wetness, vibration, fumes, odors, dusts, gases, other pulmonary irritants, unprotected heights and hazardous machinery. (R. at 17.) Due to her psychological symptoms and the side effects of

her medications, Plaintiff was further limited to simple routine work requiring an understanding of simple instructions. (R. at 17.)

Plaintiff's medical records support the ALJ's RFC assessment. Between June 2010 and March 2012, Plaintiff routinely demonstrated normal motor function and muscle strength. (R. at 325, 381, 578, 582-83, 624.) Plaintiff had normal range of motion in her knees, elbows, wrists and cervical spine. (R. at 325, 328, 394, 578, 582-83, 634, 655.) Objective medical evidence, including x-rays and MRIs of various parts of Plaintiff's body, revealed unremarkable results. (R. at 328, 379, 402-03, 449, 566, 577-78, 635, 638-40, 659.) Medication and treatment helped to alleviate Plaintiff's physical and mental symptoms. (R. at 325, 549, 582, 654, 680, 698-99, 701, 703-04, 707.) Changing positions and moving around provided some relief of Plaintiff's pain. (R. at 677.) When asked about Plaintiff's physical abilities, Dr. Burkhardt opined that he believed that Plaintiff could "certainly be qualified to perform sedentary work." (R. at 580.)

Plaintiff's own statements lend further support to the ALJ's RFC determination. Plaintiff reported that she walked and participated in water aerobics as part of her medical treatment. (R. at 675, 677-78.) She attended church and football games, and volunteered with the track team, providing verbal instruction. (R. at 16, 42-44, 679, 690, 699.) Medication improved Plaintiff's mood and outlook. (R. at 549, 680, 688, 699, 702-04, 707.) She achieved some pain relief from medications and injections. (R. at 582-83, 654, 698.) Additionally, Plaintiff socialized with her family and friends. (R. at 690.) Therefore, substantial evidence supports the ALJ's determination.

## VI.   CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for

Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a _de novo_ review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: March 5, 2015